Roy **VOLK, L.A. Donahue, Wharram Ranch Company, Thomas Mather, Charles Hope, Robert Scriver, Michael Tilton, Tommy Curran, Robert J. Rangitsch, Lawrence Rossmiller, Harold Poulsen, and Dorothy Anderson, Plaintiffs-Appellants,**

v.

**D.A. DAVIDSON & CO., et al., Defendants-Appellees.**

No. 85–3857.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 1986.

Submission Vacated April 29, 1986 and Resubmitted July 2, 1986.

Decided May 13, 1987.

Turner C. Graybill, of Graybill, Ostrem, Warner & Crotty, Great Falls, Mont., for appellant.

Edward J. Pluimer, of Dorsey & Whitney, Minneapolis, Minn., for appellee D.A. Davidson & Co.

Charles Schufreider of Barton, Klugman & Oetting argued for appellee Donald Jackson.

Sheldon M. Jaffe argued for appellees Diversified Properties Corporation, Devprop Financial Partners, Ltd., DPC Investment Corporation and Ronald L. Platt.

Augustin Medina of Lewis, D'Amato, Brisbois & Bisgaard argued for appellees Kimble, MacMichael, Jackson & Upton and Kimble MacMichael, Jackson, Magarian, Dowling & Upton.

Before GOODWIN and BRUNETTI, Circuit Judges, and STOTLER, District Judge.[*]

ALICEMARIE H. STOTLER, District Judge:

This appeal involves six consolidated cases concerning the same limited partnership tax shelters. Appellants sued in 1984, alleging that appellees fraudulently sold them limited partnership interests in 1976 and 1977. The district court granted appellees' motion for summary judgment, concluding that the statute of limitations barred the claims. It held that the statute of limitations commenced running in 1979 when appellants knew or should have known of the alleged fraud.

Appellants contended that their claim did not accrue and consequently that the statute of limitations was not triggered until they sustained out-of-pocket money damages in 1982 in the form of disallowed tax deductions. The district court rejected this assertion. We agree with the district court and affirm the judgment.

## FACTS

On January 20, 1984,[1] appellants filed their complaint for violations of § 10(b) of the Securities Exchange Act of 1934, § 17(a) of the Securities Act of 1933, the Racketeer Influenced and Corrupt Organization Act ("RICO") and various state causes of action. The appellees are: (1) Diversified Properties Corporation, DPC Investment Corp., Devprop Financial Partners Ltd., and Ronald L. Platt[2]—the promoter and general partner of the limited partnerships (the "Diversified appellees"), (2) Donald Jackson and his law firms Kimble, MacMichael, Jackson & Upton; and Kimble, MacMichael, Jackson, Magarian, Dowling, & Upton—tax counsel for the partnership offerings (the "Jackson appellees") and (3) D.A. Davidson & Co.—the broker who sold the investments ("Davidson").

Appellants invested in five limited partnerships, each organized to acquire and develop coal leases in Utah: Energy and Utility, Grand County, Devprop, Western Coal and Green River. The Energy and Utility, Grand County and Devprop appellants purchased their limited partnership interests in 1976. The Western Coal and Green River appellants purchased their interests in 1977 and made further capital

---

[*] Honorable Alicemarie H. Stotler, United States District Judge, Central District of California, sitting by designation.

[1] Appellant Anderson filed her complaint on February 8, 1984.

[2] The Estate of Ronald L. Platt has been substituted for appellee Platt.

contributions in 1978. Each limited partnership subleased what were represented as coal reserves from Intercoast Coal Company, or a related entity. Intercoast warranted that it would supply coal from substitute properties should the reserves produce fewer tons of recoverable coal than anticipated by the parties' agreement. Purchasers of the limited partnership interests received a prospectus and tax opinion letter containing geological reports indicating that the reserves had quantities of mineable coal sufficient for commercial exploitation.

Appellees marketed the limited partnership interests as tax shelters which would give rise to substantial tax deductions from ordinary income under the Internal Revenue Code. These deductions, amounting to $3.50 per dollar invested, represented partnership operating expenses for advanced royalties paid to the coal mine lessors. Each investor, being in the fifty percent tax bracket, realized current tax savings of approximately $1.75 for each dollar invested. Based on the information used to market the partnership interests, appellants also believed that their interests would appreciate from the development and mining of the coal reserves, although earnings were not to accrue prior to 1983.

In 1978, the general partner, Platt, became aware that the partnership properties did not contain the coal reserves as represented by Intercoast and in May 1979, reported this information to appellants in the partnership's 1978 annual report. The report told investors that the Internal Revenue Service ("IRS") had questioned whether the partnership properties were capable of sustaining commercially viable mining operations and, in the event they were not, raised an issue as to the propriety of the advance royalty deductions taken.

The report also stated:

(1) The IRS action was serious and could result in disallowance of the deductions. The general partner would defend the action but could not guarantee a favorable outcome.

(2) Gates Engineering Company, an independent engineering firm hired by the general partner, examined data concerning the reserves and concluded that the coal seams on the property were probably too thin and too deep for commercial exploitation.

(3) Prior to issuing the report, the general partner had requested Intercoast to provide additional properties containing adequate tonnage, as provided in the parties' agreement. Gates, however, determined that the reserves in the proposed substitute properties also lacked sufficient tonnage for development. Although the parties would continue to explore alternatives, Intercoast probably was not in a position to provide any substitute properties. Despite this negative assessment, the general partner did not plan to terminate the lease at the time of the annual report.

(4) The general partner had temporarily suspended all royalty payments by the partnership to Intercoast. The propriety of the limited partners' deductions for the royalties depended on the general partner making uniform payments over the term of the lease. The general partner had not yet decided whether to reinstate the payments.

(5) The general partner did not have the financial resources to engage in an independent exploration program for alternative mines but would continue to investigate alternatives.

(6) Intercoast had filed a petition for protection under Chapter XI of the bankruptcy laws.

In September 1979, the general partner sent ten of the twelve appellants a letter indicating that the partnership probably had a legal claim against Intercoast and that all payments to Intercoast, on which appellants' deductions were based, were suspended through 1979. In the Fall of 1979, the IRS, as part of its investigation of Platt and Intercoast, sent questionnaires from its criminal investigation division to at least four appellants concerning their investments.

Several appellants communicated their concerns about the partnership to their brokers. In each case, the broker reassured the investor. Davidson Broker Bill McFadden told Poulsen that there was no problem

about the lack of coal in the reserves because of the Intercoast agreement to replace the coal. Similarly, Davidson president Ian Davidson told Anderson not to worry about the letter. He promised to phone her if he heard any additional information.

In 1979–1980, the IRS requested that the appellants extend the time for the Service to assess the legality of their deductions. In 1982, the IRS disallowed the deductions taken by the limited partners for the years 1976, 1977 and 1978. On May 17, 1982, appellants executed an agreement tolling the statute of limitations on their claims against the Diversified appellees and Davidson.

Despite the knowledge appellants acquired from the annual report, the parties stipulated that the appellants did not have *actual* knowledge of the appellees' involvement in the allegedly fraudulent scheme prior to March 1982. With the exception of one telephone call in 1981, the appellants did not communicate with the general partner concerning the viability of the partnership as a tax shelter at any time between 1979 and 1981.

Appellants also alleged that the Jackson appellees used sham corporations to launder and embezzle appellants' investments. The general partner did not become aware of these allegations until 1983, when appellants so informed him.

The factual record consists of the parties' stipulations, declarations, and documentary exhibits compiled pursuant to the order of the district court, directing the parties to move for summary judgment on the applicability of the statute of limitations. The court stayed all discovery and ordered the parties to stipulate to certain facts for purposes of the motions, although the parties were permitted to supplement the record with their own evidence. On May 1, 1985, the district court denied appellants' motion and granted appellees' mo-

tion, holding that appellants' federal claims were barred by the statute of limitations and that the court lacked pendent jurisdiction over the state law claims. Appellants timely filed a notice of appeal purporting to appeal both the order granting appellees' motion and the order denying appellants' cross motion.[3]

## I.

### STATUTE OF LIMITATIONS

Appellants dispute the district court's ruling that the limitations period on their federal securities and RICO claims began to run before the IRS's 1982 decision to disallow their earlier years' tax deductions for the operating expenses of the partnership interests. They contend that prior to the disallowance, they did not suffer a legally cognizable injury and could not have known of their causes of action. Relying on this premise appellants suggest that the statute of limitations could not have commenced running until these out-of-pocket losses were sustained and that they would be entitled to recover damages for investment losses attributable to the tax laws.

Appellees maintain that tax consequences are not determinative of when an injury occurs. They argue (1) that any cognizable injury occurred at the time of purchase, (2) that appellants suffered damages under both statutory schemes on the date they bought securities worth less than the value represented and (3) that the statute of limitations commenced running no later than 1979 by which time the general partner's communications put appellants on inquiry notice of the allegedly fraudulent acts. We agree.

### A.

#### The Federal Securities Claims

■ The forum state's statute of limitations for general fraud claims determines

---

**3.** Orders denying motions for summary judgment are not ordinarily appealable, and the issues presented by appellants' motion here do not warrant a departure from the presumption against immediate review of interlocutory orders. *Kraus v. County of Pierce*, 793 F.2d 1105,

1106 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); 28 U.S.C. §§ 1291, 1292. Appellants' purported appeal of the denial of their motion is dismissed.

the limitations period applicable to federal securities claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[4] S.E.C. Rule 10(b)5, 17 C.F.R. § 240.10b–5,[5] and § 17(a)(2)–(3) of the Securities Act of 1933, 15 U.S.C. § 77q.[6] *Semegen v. Weidner*, 780 F.2d 727, 733 (9th Cir.1985). This Court, therefore, applies Montana's two-year limitations period. Mont.Code Ann. § 27–2–203.[7]

Although state law governs the length of the limitations period, federal law controls the point at which the statute commences to run. *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309 (9th Cir.1982). Normally, a statute of limitations period begins to run when an injury occurs, which is usually equivalent to when the cause of action accrues. In the context of fraud, however, the injury and accrual of the cause of action may occur at a time distinct and separate from the commencement of the statute of limitations period.

In fraud cases, a cause of action is generally said to accrue when a defendant commits the last overt injurious act. *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1126 (6th Cir.1982) (cause of action for fraud accrued the moment plaintiff signed a contract nullifying defendant's alleged promise; plaintiff need not wait to see if defendant paid the promised amounts). In a securities fraud case, the cognizable injury occurs at the time an investor enters, or if he currently owns stock, decides to forego entering a transaction as a result of material misrepresentations. This constitutes the injury giving rise to a cause of action, even if an actual monetary loss is not sustained until later. However, the statute of limitations is not triggered until the defrauded individual has actual or inquiry notice that a fraudulent misrepresentation has been made. *Seaboard*, 677 F.2d at 1309 (statute of limitations does not begin to run until plaintiff discovered or could have discovered the fraud through the exercise of reasonable diligence).

Application of these standards to this case shows that appellants entered into the transactions in 1976 and 1977, and thus suffered the cognizable fraud injury at that time. Their claim accrued then, too. The statute of limitations did not commence to run until 1979, however, because appellants were not placed on inquiry notice until their receipt of the 1978 annual report and the general partner's September 1979 letter.

Appellants should have brought their action once they discovered or should have discovered the facts constituting their claim. Defrauded securities purchasers are not permitted to delay bringing an action while avoidable damages accrue. *Stull v. Bayard*, 561 F.2d 429, 433 n. 4 (2d

---

4. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j provides:

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ...

 . . . . .

 (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance.

5. S.E.C. Rule 10(b)(5), 17 C.F.R. § 240.10–b–5 provides:

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce ...

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact ...

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

6. Section 17(a)(2)–(3) of the Securities Act of 1933, 15 U.S.C. § 77q provides:

 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any ... communication in interstate commerce ...

 . . . . .

 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact ...

 (3) to engage in any transaction, practice, or course of business which operates ... as a fraud ... upon the purchaser.

7. Montana Code Annotated § 27–2–203 provides:

 The period prescribed for the commencement of an action for relief on the ground of fraud or mistake is within 2 years ...

Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978).

The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.

*Id.* (quoting *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 213–14 (9th Cir.1962) (defenses of estoppel, waiver and laches are available to defendants in securities fraud cases).

Appellants rely on *Bauman v. Centex Corp.,* 611 F.2d 1115 (5th Cir.1980), to support their contention that the cause of action does not accrue until appellants suffer out-of-pocket losses. In *Bauman,* defendants purchased plaintiffs' corporation as a wholly-owned subsidiary pursuant to a stock purchase agreement, under which plaintiffs, in exchange for their stock, received, *inter alia,* 10,000 shares in an escrow account subject to an earn-out based on the company's performance over a certain term. Plaintiffs alleged defendants made certain misrepresentations concerning their plans for the subsidiary. Addressing a Texas common law fraud claim, the Court held that plaintiffs did not suffer an actionable legal injury until the escrow agreement expired and the stock reverted to the defendants, the subsidiary not having met the earn-out requirements. Until that time, the Court explained:

[I]t was possible the earn-out would be made in spite of any misrepresentations by defendants. Misrepresentation in itself is not "a completed wrong" until there is an invasion of some right of the plaintiff.... "[A] false statement, alone, does not create a cause of action for fraud ... there must be reliance by the complainant to his detriment".... "[T]here can be no ... actionable fraud unless the act *resulted in injury* to the person defrauded."

*Bauman,* 611 F.2d at 1119 (emphasis in original) (citations omitted). As appellees point out, *Bauman* is distinguishable from the case at bar. The transaction at issue in *Bauman* was not completed until the end

of the earn-out period, five years after the initial payment of 10,000 shares. Appellants here completed their purchases of the limited partnership interests on the day they paid their money and received the partnership interests. Thus, appellants' cause of action accrued at the time they purchased their investments, and the limitations period commenced when they should have discovered the alleged fraud.

Appellants further argue that even if their cause of action normally would accrue at the time of purchase, a tax shelter investment requires a different result. They contend that it was impossible for them to realize they had been injured until 1982 when their deductions were disallowed by the IRS. Coupled with this argument is the proposition that appellants' recoverable damages, had they prevailed, would include losses occasioned by adverse tax consequences sustained in 1982.

 Under the general rule, a plaintiff may recover the difference between the value of the consideration paid and the value of the securities received, plus consequential damages that can be proven with reasonable certainty to have resulted from the fraud. *Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 621 (9th Cir.1981); *Foster v. Financial Technology, Inc.,* 517 F.2d 1068, 1071–72 (9th Cir.1975). *See also Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741, *reh'g denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 and 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 347 (1972) ("where the defendant received more than the seller's actual loss ... damages are the amount of the defendant's profit"). The trial judge has the discretion to apply a rescissionary remedy which entitles a plaintiff to a return of his consideration less any value received on the investment. *Arrington,* 651 F.2d at 621; *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Thus, a plaintiff in an action under § 10(b) is generally limited to recovery of out-of-pocket losses or actual damages. § 28(a) of The Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a); *Burgess v. Pre-*

*mier Corp.*, 727 F.2d 826, 837 (9th Cir. 1984).

■ An investment which leads to a suit for fraud does not vest a prevailing purchaser with a different measure of damages solely because the investment was marketed as a tax shelter. Appellants, like all investors in tax shelters, sought the benefit of sizeable tax deductions to offset other taxable income, but they did not acquire any alienable rights to tax losses having value apart from either the securities themselves or their status as limited partners. *Randall v. Loftsgaarden,* 478 U.S. ——, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).

In *Randall,* the Supreme Court held that defrauded investors in a tax shelter, who received an award of rescission, could recover their consideration without accounting for the tax benefits received as a result of the investment. Tax savings, unlike dividend income, do not constitute income received on an investment and are not deducted from the consideration. *Randall,* 478 U.S. at ——, 106 S.Ct. at 3150. The Court "decline[d] to treat these tax losses as so much property created by the promoters of the partnership." *Id.* Investors in tax shelters acquire the same rights as purchasers of other securities; they buy the right to income accruing by virtue of their ownership and nothing more. *Id.*

This is not to say that a court must always ignore tax benefits when determining damages under § 10(b). In *Randall* the Court only addressed tax benefits which had been excluded from an award of rescission. The Court expressly did not consider the question of whether "courts may ever refuse to allow a rescissionary recovery under § 10(b) where the 'premium' for expected tax benefits represented a large portion of the purchase price, in which event the out-of-pocket measure might yield a significantly smaller recovery." *Id.*

■ Contrary to appellants' arguments, the nature of the investment as a tax shelter and the damages recoverable for fraud in connection with such investments have no bearing on the commencement of the limitations period. The actual monetary loss sustained by appellants in 1982 by virtue of the IRS disallowance is not the type of injury recognized by securities law. Investors must bring their lawsuits when they should discover that they paid an inflated price for securities as a result of misleading statements or omissions. Whatever action the IRS ultimately takes does not affect defrauded investors' rights to damages. Appellants' damages were fully cognizable prior to the IRS decision. At the time appellants should have discovered the fraud, a trial court could have fashioned appropriate legal or equitable remedies.

## B.

### *The RICO Claim*

Appellants invoke the alleged securities fraud violations just discussed as the predicate acts which sustain their RICO claim. They allege that appellees' racketeering activity resulted in appellants' purchase of worthless securities. RICO permits plaintiffs to recover for damages to their "business or property." 18 U.S.C. § 1964(c). Appellants contend that injury to their property was only occasioned by the adverse IRS action which, for the first time, put them dollars behind on their investment. Appellants conclude that the first knowledge they had of their RICO claim was in 1982 and hence that it was timely filed when brought in 1984.

Congress enacted RICO to curb "racketeering activity." *See generally,* 18 U.S.C. §§ 1961–1968. The statute defines racketeering activity as any act chargeable under certain state criminal laws; indictable under certain federal laws; and certain offenses, including securities fraud, punishable under federal law. 18 U.S.C. § 1961(1). The RICO laws bar individuals from using income derived from a "pattern of racketeering activity" through the use of an enterprise engaged in activities affecting interstate commerce. 18 U.S.C. § 1962(a). *See also Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1080 (9th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct.

1336, 94 L.Ed.2d 187 (1987). The statute requires defendants to engage in at least two predicate acts of racketeering activity which are sufficiently related and continuous to form a pattern. 18 U.S.C. § 1961(5); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ..." 18 U.S.C. § 1964(c). Thus, the statute explicitly contemplates that the plaintiff will recover damages flowing directly from the predicate acts. In *Sedima,* the Supreme Court observed that "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." 473 U.S. at 497, 105 S.Ct. at 3286.

■ Construed in light of the foregoing, appellants' RICO claim seeks redress for a compensable injury caused by the alleged securities fraud violations. This injury, as discussed above, occurred to appellants' property when they purchased worthless securities. Thus, the limitations period commenced running on these claims simultaneously.

■ This Court has held that the forum state's statute of limitations for actions based on a statute governs RICO civil actions. *Compton v. Ide,* 732 F.2d 1429, 1433 (9th Cir.1984). Montana law provides a two year statute of limitations for most liabilities created by statute. Mont.Code Ann. § 27–2–211(1)(c). As with securities claims, federal law governs the commencement of the limitations period for RICO claims. *Compton,* 732 F.2d at 1433. The limitations period begins to run when a plaintiff knows or should know of the injury which is the basis for the action. *Id.* By analogy to the securities claims discussed above, the limitations period commenced on the RICO claim on the date appellants discovered or should have discovered the fraud. In addition, the RICO statute does not provide these appellants with a means for recovering their lost tax

savings. As discussed above, the promoters of the partnership did not create tax savings and sell them as property rights to the investors. *See Randall,* 478 U.S. at –––– – ––––, 106 S.Ct. at 3153–54. The predicate acts, the securities violations, did not directly cause the loss of tax benefits. RICO prohibits the use of income derived from racketeering activity. Appellees benefited only from the purchase price of the investments. They received no benefit from appellants' tax deductions.

■ Damages recoverable under RICO, therefore, do not affect accrual of the cause of action or commencement of the limitations period. As before, the nature of the investment as a tax shelter does not alter this result.

## II.

### FRAUDULENT CONCEALMENT

Appellants maintain that appellees concealed the material facts which indicated that the investors had a claim. Were it not for appellees' intentional concealment of the cause of action, appellants contend they could have brought the suit earlier.

■ In some cases, the conduct of a defendant will toll the statute of limitations under the doctrine of fraudulent concealment. The doctrine is properly invoked only if a plaintiff establishes "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Gibson v. United States,* 781 F.2d 1334, 1345, (9th Cir.1986), *cert. denied,* –––– U.S. ––––, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987) (civil rights case) (quoting *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978) (antitrust case)). Appellants must demonstrate that they had neither actual nor constructive notice of the facts constituting their claims for relief. *Rutledge,* 576 F.2d at 250.

■ To invoke the doctrine in the complaint, appellants must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish

that they used due diligence in trying to uncover the facts. *Conerly v. Westinghouse Electric Corp.*, 623 F.2d 117, 120 (9th Cir.1980); *Rutledge*, 576 F.2d at 250. Appellees' silence or passive conduct does not constitute fraudulent concealment. *Rutledge*, 576 F.2d at 250. Further, appellants' mere ignorance of the cause of action does not, in itself, toll the statute. *Campbell*, 676 F.2d at 1127.

 the doctrine of fraudulent concealment does not toll the statute of limitations in the case at bar. Appellants do not present any facts indicating an affirmative effort on the part of any appellee to mislead them or to conceal the fraud. The general partner did fail to disclose certain geological reports known to him and the Jackson appellees prior to 1979, but appellants do not indicate that these appellees took affirmative steps to mislead appellants. Rather, appellees passively concealed the reports by not disclosing them to the investors. In such situations, the federal tolling doctrine does not apply. Appellants cannot translate their lack of due diligence into active concealment by appellees.

 Appellants Mather, Poulsen, Donohue, and Anderson require separate consideration, although they too are precluded from relying on the doctrine of fraudulent concealment to toll the statute. The Davidson brokers told these appellants not to worry about the 1978 annual report. One broker told Poulsen that Intercoast would provide substitute properties. Yet, these individuals had received the annual report which gave them constructive notice of their claims and explicitly stated that Intercoast could not provide substitute properties. Additionally, appellants failed to use due diligence in their investigation of these claims. Once appellants had clear knowledge of their claims, it was not reasonable for them to rely on reassuring comments from a broker. *See Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir.1974).

 Appellants allege that the Jackson appellees organized sham corporations to execute the scheme to defraud them. Even if appellants supplemented the record with a factual basis for this claim, there is no indication that Jackson organized these corporations to conceal the fraud. Rather, they are, as alleged, a means for the execution of the fraud.

### III.

### THE DISTRICT COURT'S DECISION TO STAY DISCOVERY

 The district court should permit discovery if it appears from the affidavits filed that the party opposing the summary judgment motion could not, for reasons stated, present facts essential to justify his opposition. Fed.R.Civ.P. 56(f). Courts will deny Rule 56(f) discovery applications where the moving party's evidence affirmatively negates the factual issues which the opposing party claims remain controverted. *See Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120 (D.C.Cir.1980); *Schlesinger v. Central Intelligence Agency*, 591 F.Supp. 60, 64–65 (D.D.C.1984). A party may not forestall an unfavorable ruling on a summary judgment motion merely by alleging fraudulent and/or conspiratorial conduct. The burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists. *VISA International Service Association v. Bankcard Holders of America*, 784 F.2d 1472, 1475 (9th Cir.1986) (courts deny Rule 56(f) applications where it is clear that the evidence sought is almost certainly nonexistent or is the object of pure speculation).

The evidence submitted overwhelmingly indicated that appellants had notice of the fraud on the date they received the 1978 annual report. Additional discovery could not reveal facts indicating appellants had less knowledge than they admittedly had. Even as to the issue of fraudulent concealment, appellants had sufficient notice of their claim such that they could not present evidence of reassurances from appellees negating that knowledge.

 A district court "has wide latitude in controlling discovery, and its rulings will not be overturned in the absence of a clear

abuse of discretion." *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1467 (9th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). The reviewing court applies the abuse of discretion standard in reviewing a district court's decision denying an application to continue a ruling on a summary judgment motion to permit discovery. *Id.* Here, there was no abuse of the district court's discretion in staying discovery.

## IV.

### STANDARD OF REVIEW

This Court reviews *de novo* a trial court's grant of summary judgment. *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir. 1983). Summary judgment is appropriate if, in viewing the evidence most favorable to the opposing party, there is no genuine issue of material fact and the substantive law was correctly applied. Fed.R.Civ.P. 56(c); *Roberts v. Continental Insurance Co.*, 770 F.2d 853, 855 (9th Cir.1985).

 Ordinarily, a defendant has an extremely difficult burden to show that a fraud action is barred as a matter of law. The determination of whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact. *Seaboard*, 677 F.2d at 1309–10. However, the extent to which a plaintiff used reasonable diligence is tested by an objective standard. *Kramas v. Security Gas & Oil, Inc.*, 672 F.2d 766, 770 (9th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982). A district court may, therefore, grant a summary judgment motion if the uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the fraud but failed to file a timely complaint. *Id.* This Court has upheld many lower court decisions granting summary judgment motions when, as a matter of law, a plaintiff knew or should have known of his injuries and failed to protect his rights in a timely fashion. *See, e.g., id.* at 770–71;

*Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir.1980); *Winkelman v. Blyth & Co.*, 518 F.2d 530, 531 (9th Cir.), *cert. denied,* 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975).

In the present case the 1978 annual report and the general partner's September 1979 letter gave the investors sufficient notice of the fraud. These two documents informed appellants that they bought investments in coal reserves which lacked mineable coal and could not sustain a viable commercial operation.[8] They, therefore, knew or should have known that they suffered a compensable injury, i.e., that they paid more for their investment than it was worth. Thus, the district court correctly found that the statute of limitations had run as to all appellees.

The judgment of the district court is therefore AFFIRMED.

---

**8.** The district court relied only on the 1978 annual report. Because the annual report sufficiently notified appellants of their claims, the fact that two appellants did not receive the September 1979 letter does not alter the result as to them.