**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEIDE BETZ,

       *Plaintiff-Appellant,*

v.

TRAINER WORTHAM & COMPANY,
INC.; DAVID P. COMO; FIRST
REPUBLIC BANK, a Nevada
corporation; ROBERT VILE,

       *Defendants-Appellees.*

No. 05-15704

D.C. No.
CV-03-03231-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
February 12, 2007—San Francisco, California

Filed October 4, 2007

Before: John T. Noonan, Jr., Ronald M. Gould, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

13461

**COUNSEL**

Joseph M. Alioto, San Francisco, California, Theodore F. Schwartz, St. Louis, Missouri, and Myron Moskovitz, Berkeley, California, for the plaintiff-appellant.

Sara B. Brody and Alexander M.R. Lyon, Heller Ehrman, LLP, San Francisco, California, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

We must decide whether Heide Betz's federal securities fraud claim is barred by the statute of limitations.[1] We hold that there is a genuine issue of material fact whether Betz's claim is time barred, and we reverse the district court's summary judgment for the defendants.

---

[1]In a separately-filed memorandum disposition, we resolve Betz's appeal of the district court's disposition of her state law claims.

# I

On an appeal of summary judgment we, like the district court, view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Viewed in the light most favorable to Betz, the facts are as follows:

In 1999, Betz, a retired art dealer, sold her house for $2.2 million. Betz planned to buy a co-op and invest the proceeds of the sale of her house to provide interest income. An employee of First Republic Bank named Carmen Castro introduced Betz to David Como, an employee of Trainer Wortham, an investment subsidiary of First Republic Bank. Como and Castro recommended that Betz invest the proceeds from the sale of her house with Trainer Wortham. Como and Castro assured Betz that, if she invested her $2.2 million with Trainer Wortham, she could withdraw $15,000 per month from her portfolio, for living expenses, without touching the $2.2 million in principal. Betz told Como and Castro that she knew nothing about stocks and bonds and that she only would understand the "bottom line," or total balance, of her account.

According to Betz, on June 7, 1999, Betz entered into an oral agreement with Como, who was acting on behalf of Trainer Wortham, giving the defendants control over her $2.2 million. Betz and Como agreed that Como would invest Betz's money "in such a fashion that [Betz] would receive $15,000 a month from the profit of the investment and that [the defendants] would not touch the principal." The same day, Betz and Como, who was again acting on Trainer Wortham's behalf, entered into a written "Letter of Understanding for Portfolio Management and Administration Services" and an "Investment Management Agreement." These documents explicitly stated that Betz's account was subject to market risk and that "no person has represented to [Betz] that any particular result can or will be achieved." However, these

documents also contained no "merger" or "integration" clauses and made no reference to the alleged oral agreement regarding Betz's $15,000 in monthly maintenance income.

After Betz opened her account with Trainer Wortham, she received account statements at least once per month. In February 2000, Betz received a statement reflecting an account value below her initial investment of $2.2 million. Between February 2000 and July 2001, Betz received twenty-nine more account statements, each reflecting an account balance of less than $2.2 million. In March 2001, Betz's account balance had dropped to $848,000. Around that time, Betz spoke with Robert Vile, a Trainer Wortham employee, to express concern about the declining value of her account. Vile told Betz that the declining balance was attributable to her monthly $15,000 withdrawals; he assured her, however, that the shortfall was temporary, that the market would recover, and that in a year or less her account balance would be back to $2.2 million. When subsequent account statements showed the balance of Betz's account continuing to fall, she met with Castro, who told her that there was a "serious problem" with the way Betz's portfolio had been managed and that the president of Trainer Wortham, Charles Moore, would "take care of the account because it was 'the right thing to do' and because [Trainer Wortham] value[d] their client relationships." In May 2002, after Betz had met with Moore in person, Castro called Betz to tell her that "Moore was meeting with other principals and attorneys" regarding her account, and that Betz "should be patient with them and not take any legal action." However, in June 2002, Castro advised Betz that Trainer Wortham was "not going to do anything at all" to remedy the declining value of her account.

Betz filed her complaint in this case on July 11, 2003, alleging that Como, Vile, Trainer Wortham, and First Republic Bank (collectively, "Trainer Wortham" or "defendants") had committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and

Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. The defendants moved for summary judgment on the ground that Betz's federal securities fraud claim was barred by the statute of limitations. Section 804(a) of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 801 (codified at 28 U.S.C. § 1658(b)), provides that a suit for securities fraud under § 10(b) of the Securities Exchange Act must be filed "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." The district court held that, because Betz had inquiry notice of the defendants' violations of § 10(b) before July 11, 2001, Betz's claims were time barred, and on this ground the district court granted summary judgment for the defendants.

## II

We review de novo the district court's grant of summary judgment. *Olympic Pipeline Co. v. City of Seattle*, 437 F.3d 872, 877 n.11 (9th Cir. 2006). Federal Rule of Civil Procedure 56(c) entitles a party to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As we noted above, in deciding a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

## III

The defendants contend that Betz's suit is time barred because she had both actual and inquiry notice of the facts giving rise to her claim. Betz contends that she had neither.

**[1]** We first address actual notice. Betz's suit is timely only if she filed it "not later than . . . 2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b).

Viewing the facts in the light most favorable to Betz, there is a genuine issue of fact about whether Betz actually discovered that she had a claim against the defendants for securities fraud more than two years before she filed her suit on July 11, 2003. For Betz to have a claim under § 10(b), the defendants must have had, among other things, scienter, which is the "mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976); *see also Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (listing the elements of a federal securities fraud claim), *petition for cert. filed sub nom. Avis Budget Group, Inc. v. Cal. State Teachers Ret. Sys.*, No. 06-560 (U.S. filed Oct. 19, 2006). In *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999), we held that to adequately plead scienter, a § 10(b) plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." We went on to describe this heightened pleading standard as follows:

> Our holding rests, in part, on our conclusion that Congress intended to elevate the pleading requirement above the Second Circuit standard requiring plaintiffs merely to provide facts showing simple recklessness or a motive to commit fraud and opportunity to do so. We hold that although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, we hold that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*Id.*

**[2]** We cannot say that, as a matter of law, Betz, before July 11, 2001, actually discovered facts suggesting that the defendants consciously or deliberately and recklessly deceived her. Under the version of facts presented by Betz, a reasonable factfinder could conclude that Betz did not discover that the defendants intentionally misled her into believing that she could withdraw $15,000 per month without depleting her principal until June 2002, when Moore told her that Trainer Wortham was "not going to do anything" to fix her account.

If the statute of limitations began running only upon Betz's actual discovery of the facts giving rise to her securities fraud claim, this would end our inquiry. However, the defendants contend that, even if Betz did not actually discover the facts underlying her claim before July 11, 2001, Betz was on "inquiry notice" of her claim before that date, and that her claim therefore is still barred by the statute of limitations. We address that argument in the next section.

## IV

### A

**[3]** We have held that the statute of limitations for a federal securities fraud claim begins to run when the plaintiff has either actual or inquiry notice that the defendants have made a fraudulent misrepresentation. *See, e.g.*, *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987). In more recent cases, however, it has been suggested that under the United States Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), only actual notice of the facts forming the alleged fraud, and not inquiry notice of those facts, triggers the running of the statute of limitations for a § 10(b) claim.[2] *See*

---

[2]Though *Gray* was decided after the Supreme Court handed down *Lampf*, in *Gray* we applied pre-*Lampf* statute of limitations principles pur-

*Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005). The uncertainty introduced by our opinion in *Berry* led us to suggest in *Livid Holdings* that, notwithstanding our unequivocal pre-*Lampf* case law, we had "considered, but not made a final determination on whether actual or inquiry notice of the alleged fraud triggers the running of Rule 10b-5's statute of limitations." *Livid Holdings*, 416 F.3d at 951.

**[4]** In *Lampf*, the Supreme Court resolved a split among the circuits regarding the statute of limitations applicable to a § 10(b) claim. *See Lampf*, 501 U.S. at 354. Some circuits had borrowed state statutes of limitations, while others had established a unique federal limitations period. *See id.* at 354 n.1. The Supreme Court in *Lampf* held that the statute of limitations provided in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e), was the appropriate standard. *See Lampf*, 501 U.S. at 364 n.9. Section 9(e) provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."[3] No one disputes that "discovery" can occur when a plaintiff actually discovers facts giving rise to his or her claim. However, *Lampf* left it to the lower courts to decide whether "discovery" occurs *only* upon actual notice or whether "discovery" can occur on some form of inquiry notice.

**[5]** We hold that either actual or inquiry notice can start the

---

suant to 15 U.S.C. § 78aa-1(a), which provides that pre-*Lampf* limitations periods apply to suits filed before *Lampf* was decided. *See Gray*, 82 F.3d at 879 n.1, 880-81.

[3]The one year/three year limitations period set forth in § 9(e) still applies to securities fraud suits filed before the enactment date of Sarbanes-Oxley, July 30, 2002. *See* Sarbanes-Oxley Act § 804(b).

running of the statute of limitations on a federal securities fraud claim. While it is unquestioned that actual notice can mark the beginning of the limitations period, two things happened in the aftermath of *Lampf* that convince us that an inquiry notice standard should also apply to federal securities fraud claims. First, the courts of appeal in our sister circuits, along with the district courts in our own circuit, have uniformly embraced inquiry notice. In fact, "every circuit to have addressed the issue since *Lampf* has held that inquiry notice is the appropriate standard." *Berry*, 175 F.3d at 704; *see Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 450 F.3d 1257, 1267-68 (11th Cir. 2006); *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *Glaser v. Enzo Biochem, Inc.*, 126 Fed. App'x 593, 597 (4th Cir. 2005) (citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500 (6th Cir. 2003); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002); *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002); *Ritchey v. Horner*, 244 F.3d 635, 638-39 (8th Cir. 2001); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1199-1200 (10th Cir. 1998); *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997); *Topalian v. Ehrman*, 954 F.2d 1125, 1134-35 (5th Cir. 1992). Likewise, the district courts in our circuit regularly apply an inquiry notice standard to § 10(b) claims. *See, e.g.*, *In re Micron Techs., Inc. Sec. Litig.*, No. CV-06-085-S-BLW, 2007 WL 576468, at *4 (D. Idaho Feb. 21, 2007); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1026 (S.D. Cal. 2005); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal. 2003); *Getty v. Harmon*, 53 F. Supp. 2d 1053, 1055 (W.D. Wash. 1999); *Freedman v. La.-Pac. Corp.,* 922 F. Supp. 377, 395 (D. Or. 1996); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1099 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *Aizuss v. Commonwealth Equity Trust*, 847 F. Supp. 1482, 1486 (E.D. Cal. 1993). While not binding on us, the reasoned opinions of ten of our sister circuits and the widespread practices of the district courts in our own circuit weigh heavily in favor of holding that inquiry notice can trigger the running of the statute of limitations on a securities fraud claim. The uniformity of the

precedent in this direction sends a signal message that inquiry notice, and not merely actual notice, can cause the statute of limitations for securities fraud to begin to run.

[6] The second post-*Lampf* event that convinces us that an inquiry notice standard is appropriate is an act of Congress. In the Sarbanes-Oxley Act of 2002, Congress extended the limitations period for § 10(b) suits from "one year after the discovery of the facts constituting the violation," 15 U.S.C. § 78i(e), to "2 years after the discovery of the facts constituting the violation" for actions commenced after July 30, 2002, 28 U.S.C. § 1658(b); Sarbanes-Oxley Act, § 804(b). In its new enactment, Congress opted for language identical to the language previously in effect in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e). The Supreme Court has instructed that we should assume that Congress is aware of the prevailing case law and legislates in its light. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379 (1982) (interpreting the Commodity Exchange Act in light of pre-enactment case law). In 2002, the prevailing case law in the lower federal courts interpreted the language of § 9(e) to mean that the limitations period could be commenced upon some form of inquiry notice. By choosing language nearly identical to the language of § 9(e), Congress implicitly approved of that case law. *See Cannon*, 441 U.S. at 696-99 (interpreting Title IX to provide a private cause of action because Congress used language identical to that found in Title VI, which had already been interpreted by the courts to provide a private cause of action); *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (per curiam) (holding that the silence of the Class Action Fairness Act regarding the burden of proving removal jurisdiction indicated Congressional intent to leave intact the common law rule placing the burden on the defendant); *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) (noting that "[i]n construing

statutes, we presume Congress legislated with awareness of relevant judicial decisions" and holding that Congress's failure to explicitly include "tribal governments" within the Federal Juvenile Delinquency Act's definition of "State," when amending other parts of the Act, "may be interpreted as an endorsement of the judicial decisions excluding tribes from the definition of 'State' ").

**[7]** We recognize that the pragmatic effects of applying an inquiry notice standard to § 10(b) are both positive and negative for individual litigants. As was suggested in *Berry*, a case decided under the old one-year limitations period, such a standard may compel plaintiffs to file a suit based on "skimpy facts." *See Berry*, 175 F.3d at 704 n.6 (quoting Charles Benjamin Nutley, Comment, *Triggering One-Year Limitations on Section 10(b) and Rule 10b-5 Actions: Actual or Inquiry Discovery?*, 30 San Diego L. Rev. 917, 948 (1993)). However, Congress's extension of the relevant limitations period from one to two years alleviates this concern and allows us to conclude that an inquiry notice standard strikes an acceptable balance between the interest in requiring plaintiffs promptly to file suit and the competing interest in avoiding the encouragement of baseless or premature suits by requiring plaintiffs to sue before they can discover the facts underlying their claims. *See New England Health Care Employees Pension Fund*, 336 F.3d at 501; *Young*, 305 F.3d at 9; *Sterlin*, 154 F.3d at 1202.

**B**

**[8]** We have previously stated that, if we were to adopt an inquiry notice standard for § 10(b) suits, we would apply a standard similar to that applied by the Tenth Circuit. *See Livid Holdings*, 416 F.3d at 951; *Berry*, 175 F.3d at 704. Today we adopt the inquiry-plus-reasonable-diligence test used by the Tenth Circuit. *See, e.g.*, *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998) (holding that inquiry notice "triggers an investor's duty to exercise reasonable diligence and that the . . . statute of limitations period begins to run once the

investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."). Under that standard, to determine when the statute of limitations begins running, we first determine when the plaintiff had inquiry notice of the facts giving rise to his or her securities fraud claim. A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further. Like our sister circuits, we caution that inquiry notice should not be construed so broadly that the particular plaintiff cannot bring his or her suit within the limitations period. The facts constituting inquiry notice "must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997), *quoted in Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1284 (11th Cir. 2005). Once a plaintiff has inquiry notice, we ask when the investor, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. The answer to that second question tells us when the statute of limitations began to run.

**[9]** The question of whether inquiry notice exists is objective and contemplates a "reasonable investor" or "reasonable person" standard. *See, e.g.*, *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (citations and internal quotation marks omitted) (holding that inquiry notice of securities fraud is triggered when the plaintiff receives "sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved"); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001) (holding that inquiry notice exists where "a reasonable investor of ordinary intelligence would have discovered the [suspicious] information and recognized it" as suspicious); *Great Rivers Coop. of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997) (inquiry notice is present "when the victim is aware of facts that would lead a reasonable person to investigate and conse-

quently acquire actual knowledge of the defendant's misrepresentations."). The existence of inquiry notice is only the first prong of the two-part notice-plus-reasonable-diligence test that we are today adopting, and the second stage of that inquiry, the question of whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud, while remaining essentially objective in character, necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor. In this second stage of the inquiry, one of the factors to be considered is whether the plaintiff was given any assurances by a defendant after beginning to investigate the suspicious circumstances that would have delayed discovery of the fraud by a reasonable person in the plaintiff's position. For example, in a situation much like the instant case, we have held that, when an investor met with representatives of a defendant company about possible fraud and was assured that there "had been no improprieties," whether the statute of limitations began running was a question for the trier of fact. *See SEC v. Seaboard Corp.*, 677 F.2d 1301, 1310 (1982). In that case, we concluded that "the question of what a reasonable investor would have done [under those circumstances] is not so certain as to allow a determination as a matter of law." *Id.*

Moreover, under the notice-plus-reasonable-diligence standard we apply to securities fraud claims, the defendant bears a considerable burden in demonstrating, at the summary judgment stage, that the plaintiff's claim is time barred. *See Seaboard Corp.*, 677 F.2d at 1309-10 (noting that "the question of notice of fraud is for the trier of fact" and that "the party seeking summary disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice"). "Summary judgment is appropriate only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Gray*, 82 F.3d at 881 (internal quotations omitted); *see also Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984) ("The question of what a reasonably pru-

dent investor should have known is particularly suited to a jury determination.").[4] Our hesitation to approve summary judgment in securities fraud cases is especially pronounced where the plaintiff alleges that the defendants' reassurances

---

[4]We have in some cases resolved by summary judgment the question of whether a federal securities plaintiff had sufficient notice of alleged fraud to trigger the statute of limitations. In *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369 (9th Cir. 1988), for example, we concluded that summary judgment on the issue of notice was proper because the plaintiff was a well-educated and experienced investor who made suggestions to his broker about his portfolio and who described himself as a "sophisticated investor." *Id.* at 1370. By contrast, Betz had informed the defendants that she had no experience with stocks or bonds and would only understand the bottom line of her account statements, and thereafter, if we credit Betz's testimony, received specific assurances from the president of Trainer Wortham that her account problems would be resolved and that she should forego suit. We also affirmed a summary judgment recognizing inquiry notice in the case of *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987). *Volk* involved several investors who purchased limited partnership interests in coal mining operations marketed as tax shelters and who were subsequently informed by the general partner both through a letter and an annual report that the partnership properties did not contain minable coal reserves as warranted and that the investors might therefore not be legally entitled to the tax deductions they had been taking. *Id.* at 1409-10. The investors argued that the statute of limitations on their securities fraud claim did not begin running until the IRS disallowed their deductions and they first suffered out-of-pocket losses, but the court held as a matter of law that the statute began to run when they received the letter and annual report from the general partner putting them on inquiry notice of the problem with the coal reserves. *See id.* at 1411. However, *Volk* differs from the case before us in that the warnings that the *Volk* investors received indicated a much more permanent and fundamental type of problem with the underlying investment than the declining account balances experienced by Betz, which, at least in theory, could have reversed themselves over time. In addition, while some of the investors in *Volk* also received reassurances from the defendant investment company when they expressed concerns about the general partner's communications, these assurances took the general form of admonitions "not to worry" about the letter, *id.*, whereas in Betz's case she claims that she was specifically promised that the president of Trainer Wortham would remedy the problems with her account because it was "the right thing to do" and that in the meantime she should refrain from taking any legal action against the company.

convinced the plaintiff to postpone his or her legal action. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984).

We now turn to the facts of this case. Under our inquiry notice standard outlined above, and keeping in mind that this case is before us on summary judgment, we ask whether there is a genuine dispute about whether there existed facts sufficiently probative of fraud to cause a reasonable investor to conduct a further investigation. Viewing the facts in the light most favorable to Betz, a rational jury could conclude that a reasonable investor in Betz's shoes would not have initiated further inquiry before July 11, 2001.

**[10]** The defendants contend that the account statements Betz received would have spurred a reasonable investor to inquire further whether Trainer Wortham had defrauded her. However, the account statements indicated, at most, that the defendants had failed to fulfill their oral promise that Betz could withdraw $15,000 per month from her account without depleting the principal. As a matter of law, we cannot say that a declining account balance, in and of itself, would have spurred a reasonable investor to further inquire whether he or she had been *defrauded. See Gray*, 82 F.3d at 881 ("It is well settled that poor financial performance, standing alone, does not necessarily suggest securities fraud . . . , but could also be explained by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on inquiry notice."); *see also Livid Holdings*, 416 F.3d at 951 ("This court has held that financial problems alone are generally insufficient to suggest fraud.").

**[11]** Likewise, Castro's statement that there was a "serious problem" with Betz's portfolio did nothing more than indicate to Betz that the defendants had not been able to make good on their promise of at least $15,000 per month in interest income. Because such a statement provided no evidence that the defendants had intentionally or deliberately and recklessly

misled Betz as *Silicon Graphics* requires to state a claim for securities fraud, *see Silicon Graphics*, 183 F.3d at 974, a rational jury could conclude that, upon hearing such a statement, a reasonable investor would not have initiated further inquiry into the existence of fraud. *See Fujisawa Pharm.*, 115 F.3d at 1335 (noting that "[t]he facts constituting [inquiry] notice must be sufficiently probative of *fraud*" (emphasis added)).

Moreover, even if Betz was on inquiry notice of fraud, under the second prong of our inquiry notice standard, we cannot say that, as a matter of law, Betz, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. In this case, Betz questioned the defendants about her account and the defendants assured her that they would take care of any problems and asked her not to file suit. In *Seabord Corp.*, the defendant's giving of assurances in response to a codefendant's inquiries, which had the effect of lulling the codefendant and delaying the onset of legal action, was held to preclude summary judgment and create an issue for the trier of fact as to when the statute of limitations began to run. *See Seaboard Corp.*, 677 F.2d at 1310. Trainer & Wortham's assurances to Betz in this case, which were given as recently as May of 2002, similarly give rise to a fact issue which makes summary judgment inappropriate.

We do not suggest, however, that there is a *per se* rule that in all cases involving assurances from a brokerage firm to an investor, the issue of inquiry notice must go to a jury. Rather, we conclude that here, in the total circumstances, and from the point of view of a reasonable investor, there was a genuine issue whether Betz should be held to have had notice of securities fraud.

## V

**[12]** In summary, we hold that, once there exists sufficient indicia of fraud to cause a reasonable investor to inquire into

whether he or she has been defrauded, the statute of limitations on a claim under § 10(b) of the Securities Exchange Act begins running when the investor, in the exercise of reasonable diligence, should have discovered the facts giving rise to his or her claim. In this case, we cannot say that, as a matter of law, a reasonable investor in Betz's position should have discovered the facts giving rise to her claim before July 11, 2001, especially in light of the express assurances made by Defendants that they would remedy the problems with the account, which may have lulled a reasonable investor into inaction. Thus, a jury must determine whether a reasonable investor would have discovered the fraud while receiving active assurances from the highest levels of the securities firm that there was no problem with her account and all would be made right. We reverse the district court's judgment in favor of the defendants and remand this case for further proceedings consistent with our opinion.

**REVERSED AND REMANDED.**