858 F.2d 499
 1988-2 Trade Cases 68,249
 CONMAR CORPORATION, a California corporation; L.R. Yegge
Company, a California corporation; Lawrence R.
Yegge, as assignee of L.R. Yegge Co.,
Plaintiffs-Appellants,
v.
MITSUI & COMPANY (U.S.A.), INC., a New York corporation;
Mitsui Bussan Kabushiki Kaisha, a foreign corporation; VSL
Corporation, Inc., a California corporation; Shinko Wire
Co., Ltd., a foreign corporation; Losinger AG, a foreign
corporation, Defendants-Appellees.
 No. 87-2556.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1988.
Decided Sept. 27, 1988.
As Amended Oct. 24, 1988.
 
 John H. Dresslar, Robert A. Susk, Leslie J. Mann, Law Offices of Robert Susk, San Francisco, Cal., for plaintiffs-appellants.
 James L. Hunt, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before PREGERSON, BOOCHEVER and BEEZER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 Conmar Corp. et al. (Conmar) appeal from the district court's grant of summary judgment to defendants Mitsui & Co. et al. (Mitsui). The district court found that there was no genuine issue of material fact that the four-year statute of limitations had run on Conmar's antitrust claim against Mitsui. We reverse.
 
 FACTS
 
 2
 Conmar and L.R. Yegge Co. are contractors who post-tension concrete. Lawrence R. Yegge is the president of both companies. To obtain greater strength and improved structural characteristics, concrete is post-tensioned after the poured concrete is hardened by stretching previously inserted steel wire strands (PC-strand). Defendants Mitsui and Mitsui Bussan Kabushiki Kaisha import into the United States products that defendant Shinko Wire Co. manufactures, including PC-strand. Defendant VSL Corp. is a competitor of Conmar and a wholly-owned subsidiary of defendant Losinger AG.
 
 
 3
 In December 1980, United States custom agents seized Mitsui records and a federal grand jury was impaneled in the Northern District of California to investigate possible customs violations. Mitsui allegedly was "dumping" steel products, i.e. importing them at below fair market value, in part by using false customs reports. News coverage in early 1981 of these events included three articles in the San Francisco Chronicle, one of which specified PC-strand as one of the products involved. Also reporting the investigation were two Wall Street Journal articles. One of these mentioned that PC-strand was involved, and that records of sales to VSL were being sought in the search. Single articles appeared in the Los Angeles Times and the New York Times. Major wire services also carried the story.
 
 
 4
 On March 23, 1981, the affidavit by Customs Agent Thomas Yasueda, which had been the basis for a warrant to search Mitsui's San Francisco office, was unsealed. The district court redacted the affidavit to exclude the names of American companies and employees. Yasueda alleged that Mitsui imported nearly $33 million worth of PC-strand in 1977-1979 and engaged in a complicated scheme to dump PC-strand by splitting with the customer the difference between nominal and actual exchange rates, then falsely reporting the rates to the Customs Service. Reports of the unsealing of the affidavit included two articles in the San Francisco Chronicle, in one of which a Mitsui executive characterized the investigation as "based on a distortion or misunderstanding of the facts and a misinterpretation of anti-dumping regulations." The Los Angeles Times carried a brief report of the affidavit's release and Mitsui's reaction. The New York Times reported the story, as did Business Week and the San Jose Mercury-News. None of these articles mentioned PC-strand. Wire services carried the story.
 
 
 5
 Later that year, on June 30, 1981, Pacific Steel & Supply Co., a Mitsui customer, was indicted for falsifying customs documents to mask the alleged dumping of Japanese steel nails. The indictment received news coverage in the San Francisco Chronicle (2 articles), the Wall Street Journal, the New York Times, and wire services. An antitrust suit was filed in the Northern District of California against Pacific Steel and Mitsui less than a month later, alleging that the illegal purchases of steel nails at prices below those reported were part of a conspiracy to monopolize the market.
 
 
 6
 In January 1982, VSL and one of its employees pled guilty to charges of aiding and abetting Mitsui in filing false customs declarations regarding the true price of PC-strand VSL bought from Mitsui. At least one paper reported the guilty plea.
 
 
 7
 On July 20, 1982, a fifty-nine page indictment issued charging Mitsui with violating customs reporting laws. The indictment charged that Mitsui and several of its employees conspired to defraud the United States by filing false customs entry forms to avoid the application of anti-dumping laws. Mitsui was alleged to have used false damage claims, false cancellation penalties, false secret commission payments, and undisclosed yen/dollar exchange payments. The indictment named VSL as a purchaser receiving from Mitsui PC-strand which was reported to customs at falsely inflated prices, and in eight pages detailed the methods used. The indictment did not suggest that Mitsui or VSL intended to give VSL a price advantage over its competitors.
 
 
 8
 Two lawsuits were filed in October and December of 1982 based on information in the indictment, alleging antitrust violations based on Mitsui's dumping of steel products. After a visit in January 1986 from an attorney in the latter case, Conmar filed suit on Monday, July 21, 1986, four years after the issuance of the Mitsui indictment. Conmar's second amended complaint alleged that VSL obtained PC-strand from Mitsui at illegally low prices in a conspiracy to violate dumping laws, and that the low prices allowed VSL to submit low bids for post-tensioning jobs, with the intent of suppressing competition in the industry, again in conspiracy with Mitsui. Conmar also alleged that the anticompetitive acts were "by their very nature designed to conceal themselves from detection" and that defendants "actively, fraudulently and successfully concealed the existence of their agreements, conspiracies, and anti-competitive conduct" by submitting false documents, invoices, and customs forms, as well as by altering others, as described in the Mitsui indictment.
 
 
 9
 On April 27, 1987, Mitsui moved to dismiss the lawsuit for failure to state a claim and for summary judgment on the ground that the four-year statute of limitations had run. After a hearing on June 5, 1987, the district court ruled from the bench that summary judgment would be granted, and issued its order on July 28, 1987.
 
 ANALYSIS
 
 10
 We review de novo the district court's grant of summary judgment. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987). Where the moving party has identified the portions of the material before the court that it claims shows the absence of any genuine issue of fact, the nonmoving party must set forth by affidavit or otherwise specific facts demonstrating that there is a genuine issue for trial. Id. at 630. The evidence must be viewed, and inferences from the evidence must be drawn, in the light most favorable to the nonmoving party. Id. at 630-31.
 
 
 11
 Antitrust actions under the Clayton Act are subject to a four-year statute of limitations. 15 U.S.C. Sec. 15b (1982). Conmar concedes that it filed its action more than four years after the activities that form the basis for its complaint of antitrust conspiracy, but contends that fraudulent concealment by Mitsui tolled that statute of limitations.
 
 
 12
 To toll the statute of limitations under this theory, Conmar must do more than show that it was ignorant of its cause of action. It must prove that Mitsui "fraudulently concealed the existence of the cause of action so that [Conmar], acting as a reasonable person, did not know of its existence." Hennegan v. Pacifico Creative Service, Inc., 787 F.2d 1299, 1302 (9th Cir.), cert. denied, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986). Conmar carries the burden of pleading and proving fraudulent concealment; it must plead facts showing that Mitsui affirmatively misled it, and that Conmar had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts. Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 249-50 (9th Cir.1978). Conclusory statements are not enough. Conmar must plead with particularity the circumstances of the concealment and the facts supporting its due diligence. Id. at 250. The district court may grant summary judgment if uncontroverted evidence "irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint." Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1417 (9th Cir.1987).
 
 
 13
 Conmar's second amended complaint alleged that Mitsui concealed its anticompetitive behavior by the elaborate scheme of false documentation and secret payments described in the July 1982 indictment of Mitsui for customs violations. To support its contention that it acted with due diligence in attempting to discover its cause of action, it submitted in opposition to the summary judgment motion a seven-page declaration of Lawrence R. Yegge, Conmar's president, detailing his business life and habits and specifying that he had not read any of the newspaper articles nor known of Mitsui's legal troubles until sometime after the indictment. Mitsui was not a Conmar supplier, and Conmar's counsel informed the court that Yegge did not know that Mitsui supplied VSL with PC-strand.
 
 
 14
 The central question, however, is not whether Conmar had actual knowledge of its antitrust cause of action, but whether before June 20, 1982, it should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim. See Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir.1975) ("Any fact that should excite his suspicion is the same as actual knowledge of his entire claim."). Mitsui argues that Conmar itself has answered that question in the affirmative by conceding that the Mitsui indictment provided sufficient information for constructive knowledge of its claim. Mitsui claims that prior to the filing of the indictment, all the information it contained was in the public domain. It concludes that Conmar has thus admitted that there was enough to put it on inquiry outside the limitations period.
 
 
 15
 Mitsui points to the amended complaint, but there Conmar stated that it did not discover the facts underlying its cause of action "until sometime after MITSUI (U.S.A.) and certain individual employees of MITSUI (U.S.A.) and MITSUI (Japan) were indicted on or about July 20, 1982" (emphasis added). Mitsui also relies on Conmar's mention of VSL's and Mitsui's 1982 guilty pleas and Conmar's filing of its complaint four years to the day after the Mitsui indictment. Yet Conmar's mention of the pleas in its complaint does not constitute an admission that these pleas put it on constructive notice of its claim, nor does its filing of the complaint four years after the indictment concede that it learned of its cause of action when the indictment was filed.
 
 
 16
 Mitsui repeated this assertion at the hearing on summary judgment. Conmar did not directly contest it, except to say that its complaint was within the statute of limitations from the date of the indictment, which Mitsui characterized as a "concession ... that it was that indictment which started the statute running." The court seemed to rely on this, asking whether the June 1981 Pacific Steel indictment was substantially similar and then concluding that the "means of knowledge was certainly available by at least June of 1981." The court then found that Yegge had not met the standard for due diligence in investigating his claim after that date. The court's further discussion of his due diligence after the Mitsui indictment is irrelevant to the issue of due diligence prior to commencement of the statutory period.
 
 
 17
 We find that Conmar did not concede that the 1982 Mitsui indictment put it on constructive notice of its claim. We therefore must decide whether there exist genuine questions of material fact whether: information before the Mitsui indictment was enough to put Conmar on notice, Conmar exercised due diligence in trying to uncover its claim, and any absence of facts sufficient to put Conmar on notice was the result of fraudulent concealment by Mitsui.
 
 A. Constructive Notice
 
 18
 The information available before the Mitsui indictment consisted mainly of news coverage of the customs investigation of Mitsui for dumping steel products. Only one San Francisco Chronicle article mentioned PC-strand, as did one Wall Street Journal article, which also mentioned that sales to VSL were being investigated. Although wire service stories also mentioned PC-strand Mitsui produced no evidence that any newspaper carried the stories. The only mention of VSL's January 1982 guilty plea to aiding and abetting the filing of false customs declarations was in an article identified in an affidavit as a Wall Street Journal article, undated and unlocated as to page. Although the Yasueda affidavit detailed Mitsui's dumping of PC-strand, it contained no reference to VSL, and the news articles reporting it made no mention of VSL or PC-strand.
 
 
 19
 The June 1981 indictment relied on by the district court charged a Mitsui customer with falsifying customs documents to mask the dumping of steel nails. A competitor filed an antitrust suit a month later; no news coverage of the latter was alleged or produced.
 
 
 20
 Cases refusing to toll the statute of limitations for fraudulent concealment have required more to find as a matter of law that sufficient facts were available to put the plaintiff on notice of his or her claims. In Volk, this court found that investors who received an annual report and a letter detailing the limited partnership's investments could not toll the statute of limitations for fraud, because the documents made it clear that they had paid more for their investment than it was worth. 816 F.2d at 1417. In Rutledge, a claim of fraudulent concealment failed where the plaintiff had litigated similar issues in an earlier case and had expressed suspicions about the defendants' wrongdoing. 576 F.2d at 250.
 
 
 21
 Other circuits have reached similar results. See, e.g., Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 218 (4th Cir.1987) (where antitrust action alleged interrelationships between defendant companies, and those interrelationships were readily discoverable on consultation of public mining records, no fraudulent concealment); United Klans of America v. McGovern, 621 F.2d 152, 154-55 (5th Cir.1980) (claim of fraudulent concealment defeated by evidence of press conference receiving national coverage including television coverage, express mention of plaintiff as subject of probe, coverage in two local newspapers, Senate report about the program, and notice by letter to president of plaintiff that he may have been target of investigation); Dayco, 523 F.2d at 394 (congressional hearings on same antitrust violations complained of by plaintiffs and industry-wide publicity of FTC suit should have aroused plaintiff's suspicions; no fraudulent concealment).
 
 
 22
 The district court relied heavily on In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir.1979), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). Yet that case concluded that summary judgment was inappropriate even where the defendant has demonstrated that the plaintiff should have known of some information arousing his inquiry. The Fifth Circuit held that where plaintiffs knew or should have known of a similar antitrust complaint due to widespread industry publicity, this was "not as a matter of law tantamount to actual or constructive knowledge of their claim" without awareness of "some evidence tending to support it." Id. at 1171 (emphasis in original).
 
 
 23
 In Robuck we upheld as not clearly erroneous a finding after trial that there was no fraudulent concealment where an investor claiming fraud received monthly statements of his accounts and had access to daily newspaper reports of the trading values of his securities. We indicated that there were conflicting inferences to be drawn from the record. Robuck v. Dean Witter & Co., 649 F.2d 641, 643, 644 (9th Cir.1980). Summary judgment would therefore have been inappropriate.
 
 
 24
 Mitsui also argues that Conmar was aware of VSL's growth and a corresponding decrease in competition, and so should have been alerted to antitrust claims by the customs violations information. The sources Mitsui cites--Conmar's complaint and Yegge's declaration--do not in any way indicate that Conmar was aware of these trends before June of 1982. Conmar also asserts that it was not aware that Mitsui supplied VSL.
 
 
 25
 Mitsui further points to other antitrust complaints filed before Conmar's as evidence that Conmar should have been on notice of its claim. The district court judge had presided over each of these cases. Only one of the complaints was filed before the 1982 Mitsui indictment, and appellants produced no media coverage of its filing. That complaint was based on the June 1981 Pacific Steel indictment and involved steel nails. Its existence, even had Conmar known of it, would not, as a matter of law, lead to the conclusion that Conmar should have filed a similar suit. First, it was not publicized. See Beef Industries, 600 F.2d at 1170 (plaintiffs knew or should have known of widely publicized antitrust complaint). Even if Conmar were charged with knowledge of it because it was a matter of public record, see id., that knowledge would not necessarily justify the filing of a complaint, and so the issue of whether the statute of limitations was tolled would be inappropriate for summary judgment. "The leap from the plaintiffs' knowledge of the ... complaint to actual or constructive knowledge of their cause of action therefore involves factual issues.... [A]n inference that the plaintiffs would have discovered adequate support before [the start of the limitations period] had they been reasonably diligent.... is not so compelling as to entitle the defendants to summary judgment." Id. at 1171.
 
 
 26
 We find there was a genuine issue of material fact whether information available before June of 1982 was enough to put Conmar on notice of its antitrust claim and start the limitations period.
 
 B. Due Diligence
 
 27
 Where a plaintiff's suspicions have been or should have been excited, there can be no fraudulent concealment where he "could have then confirmed his earlier suspicion by a diligent pursuit" of further information. Rutledge, 576 F.2d at 250. The requirement of diligence is only meaningful, however, when facts exist that would excite the inquiry of a reasonable person. See Volk, 816 F.2d at 1416 (where investors received annual report that should have alerted them to fraud, no due diligence when they subsequently failed to investigate); Dayco, 523 F.2d at 394 (where facts exist that should have excited plaintiff's suspicion, plaintiff must show what steps it took to establish due diligence).
 
 
 28
 Mitsui claims that due diligence is irrelevant when the facts putting the plaintiff on notice are in the public domain. This is incorrect. The due diligence Conmar must show is its attempts to uncover its claim from those facts, if indeed they were sufficient to excite suspicion.
 
 
 29
 The district court found that Conmar's duty to exercise due diligence began in June of 1981, and that Conmar failed to exercise such diligence. The record does not show any inquiry by Conmar after that date. However, because we find that there is a genuine issue of material fact whether the facts publicly available were sufficient to excite Conmar's inquiry, then no due diligence need be demonstrated for Conmar to survive summary judgment. It is irrelevant whether Conmar was diligent in pursuing its possible claims after the filing of the Mitsui indictment in July of 1982, because no due diligence is required within the limitations period.
 
 C. Fraudulent Concealment
 
 30
 Conmar claims that Mitsui's acts constitute fraudulent concealment because they were by nature self-concealing. We require more. A plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the result of affirmative conduct by the defendant. Volk, 816 F.2d at 1415. See Pinney Dock and Transport Co. v. Penn Central Corp., 838 F.2d 1445, 1472 (6th Cir.1988); Hill v. Texaco, 825 F.2d 333, 335 (11th Cir.1987); but see State of New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir.1988) (enough for fraudulent concealment that conspiracy was by nature self-concealing); King & King Ent. v. Champlin Petroleum Co., 657 F.2d 1147, 1156 (10th Cir.1981) (active concealment and self-concealing conduct enough for fraudulent concealment) cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).
 
 
 31
 Passive concealment of information is not enough to toll the statute of limitations, Volk, 816 F.2d at 1416, unless the defendant had a fiduciary duty to disclose information to the plaintiff. Rutledge, 576 F.2d at 250. An affirmative act of denial, however, is enough if the circumstances make the plaintiff's reliance on the denial reasonable. Id.
 
 
 32
 Conmar's amended complaint charges that Mitsui affirmatively acted to conceal its anticompetitive behavior by creating customs and other documents falsely reporting prices for PC-strand. A jury could believe that the filing of false customs forms was affirmative conduct sufficient for a finding of fraudulent concealment which prevented Conmar from being alerted to the manipulation of PC-strand prices. In addition to the false customs forms, Conmar identifies as the affirmative conduct necessary for fraudulent concealment Mitsui's statements in the press, following the unsealing of the Yasueda affidavit, that the investigation was based on misunderstanding and misinterpretation of customs regulations. Under the circumstances of this case, it would not have been unreasonable for Conmar to rely upon Mitsui's contention that the customs investigation was a mistake. This is not a situation in which Mitsui simply "fail[ed] to own up to illegal conduct upon [a] ... timid inquiry [from the already suspicious plaintiff]," Pocahontas, 828 F.2d at 218, but rather a direct public denial of any wrongdoing before sufficient facts existed to make Conmar suspicious. Cf. Rutledge, 576 F.2d at 250 (because plaintiff was already suspicious, his reliance on defendant's denial of price discrimination was not reasonable).
 
 
 33
 Mitsui replies that once the information was in the public domain, fraudulent concealment of that information was impossible, and that with the filing of the Pacific Steel indictment in June of 1981, Mitsui's customs violations were a matter of public record. It is true that "[w]hen the claim is one of concealment and the very facts allegedly concealed are available in public records, the argument that the plaintiffs should, as a matter of law, be held to constructive knowledge of their cause of action is much stronger." Maughan v. SW Servicing, Inc., 758 F.2d 1381, 1388 (10th Cir.1985). The facts made public in Pacific Steel, however, involved steel nails and no competitor of Conmar's. That Mitsui had committed customs violations with this customer and this steel product was not enough to alert Conmar to its possible antitrust claims. The facts that could serve as a basis for its claim were still concealed from Conmar and not a matter of public record.
 
 
 34
 We find there was a genuine issue of material fact as to whether the lack of adequate information was due to Mitsui's fraudulent concealment.CONCLUSION
 
 
 35
 Summary judgment refusing to find fraudulent concealment to toll the statute of limitations was inappropriate. We conclude that there were genuine issues of material fact whether information available before July of 1982 was enough to put Conmar on constructive notice of its claim, and whether the lack of information was due to Mitsui's fraudulent concealment so as to toll the statute of limitations. We therefore REVERSE the summary judgment.