**In re COORDINATED PRETRIAL PRO-CEEDINGS IN PETROLEUM PROD-UCTS ANTITRUST LITIGATION.**

**No. MDL 150 AWT.**

United States District Court,
C.D. California.

Dec. 31, 1991.

As Corrected March 2, 1992.

See also 782 F.Supp. 481.

Michael I. Spiegel, Wayne M. Liao, Charles M. Kagay, Spiegel, Liao & Kagay, San Francisco, Cal., Grant Woods, Atty. Gen. of State of Ariz., H. Leslie Hall, Jeri K. Auther, Asst. Attys. Gen., Consumer Protection & Antitrust Section, Phoenix, Ariz., for State of Ariz.

Daniel E. Lungren, Atty. Gen. of State of Cal., Thomas Dove, Deputy Atty. Gen., San Francisco, Cal., Mary Elizabeth Alden, Deputy Atty. Gen., Sacramento, Cal., Lawrence R. Tapper, Deputy Atty. Gen., Los Angeles, Cal., Sanford N. Gruskin, Asst. Atty. Gen., San Diego, Cal., for State of Cal.

David Frohnmayer, Atty. Gen. of State of Or., Andrew E. Aubertine, Asst. Atty. Gen., Dept. of Justice, Financial Fraud Section, Salem, Or., for State of Or.

Kenneth O. Eikenberry, Atty. Gen. of State of Wash., John R. Ellis, Deputy Atty. Gen., Jon P. Ferguson, Asst. Atty. Gen., Seattle, Wash., for State of Wash.

Otis Pratt Pearsall, Philip H. Curtis, Bruce R. Kelly, Arnold & Porter, New York City, Ronald C. Redcay, Matthew T. Heartney, Arnold & Porter, Los Angeles, Cal., Donald A. Bright, Thomas H. Reilly, Atlantic Richfield Co., Los Angeles, Cal., for Atlantic Richfield Co.

Robert A. Mittelstaedt, Pillsbury, Madison & Sutro, Washington, D.C., Roderick M. Thompson, Pillsbury, Madison & Sutro, Paul R. Truebenbach, Chevron Corp., San Francisco, Cal., for Chevron Corp.

Howard J. Privestt, David A. Destino, Baker & Hostetler, McCutchen Black, Los Angeles, Cal., John H. Lewis, Jr., Jay H. Calvert, Jr., Joseph W.G. Fay, Morgan, Lewis & Bockius, Philadelphia, Pa., John R. Rebman, J. Anthony Chavez, Exxon Corp., Houston, Tex., for Exxon Corp.

Andrew J. Kilcarr, Maureen O'Bryan, Janet L. McDavid, Hogan & Hartson, Washington, D.C., Donald J. Frickel, Mobil Oil Corp., Fairfax, Va., for Mobil Oil Corp.

William R. O'Brien, Alan M. Grimaldi, Robert M. Bruskin, Howrey & Simon, Washington, D.C., Fred H. Bartlit, Jr., Kirkland & Ellis, Chicago, Ill., Jeffrey S. Davidson, Philip S. Swain, Todd A. Gale, Tony L. Richardson, Kirkland & Ellis, Los Angeles, Cal., Raymond V. McCord, Shell Oil Co., Universal City, Cal., for Shell Oil Co.

Barry Willner, Milton J. Schubin, Randolph S. Sherman, Kaye, Scholer, Fierman, Hayes & Handler, New York City, Robert D. Wilson, Robert E. Fuller, Texaco Inc., White Plains, N.Y., Leslie C. Randall, Texaco Inc., Universal City, Cal., for Texaco Inc.

Darryl Snider, Daniel J. Tyukody, Jr., Brobeck, Phleger & Harrison, Los Angeles, Cal., William J. Taylor, Brobeck, Phleger & Harrison, San Francisco, Cal., Patricia Burrall Woolls, UNOCAL Corp., Union Oil Cen-

ter, Los Angeles, Cal., for Union Oil Co. of California.

## MEMORANDUM DECISION AND ORDER RE FRAUDULENT CONCEALMENT

TASHIMA, District Judge.

Defendants have moved for summary judgment on the issue of whether or not the doctrine of fraudulent concealment can be invoked by plaintiffs to toll the running of the statute of limitations on their antitrust claims. The issue presented by the motion is whether, as a matter of law, plaintiffs lack sufficient evidence to prove a *prima facie* case that defendants fraudulently concealed their alleged price fixing conspiracy until the early to mid–1970s.[1] Although the underlying facts are essentially undisputed, determination of the issue depends on the inferences to be drawn from these facts—intent to conceal, actual knowledge and constructive knowledge. What inferences properly to draw from the facts are factual issues. Since reasonable jurors could resolve these issues in plaintiffs' favor, the motion must be denied.

## DISCUSSION

I. *The Fraudulent Concealment Doctrine*

Under the equitable doctrine of fraudulent concealment, the applicable statute of limitations is tolled "if the plaintiff proves the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence."

*E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989) (citation omitted).

■ To prove fraudulent concealment, a plaintiff must show that defendant "affirmatively misled it, and that [plaintiff] had neither actual nor constructive knowledge of the facts giving rise to its claim despite its due diligence in trying to uncov-

er those facts." *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989) (citation omitted). This rule can be broken down into three elements: "(1) [defendant] fraudulently concealed the conspiracy, (2) [plaintiff] did not discover the facts which form the basis of the claim, and (3) [plaintiff] exercised due diligence in attempting to discover the facts." *E.W. French*, 885 F.2d at 1399 (citation omitted).

■ These are all factual questions. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir.1987). Plaintiffs have the burden to prove fraudulent concealment. *Conmar*, 858 F.2d at 502. At the summary judgment stage, "Ordinarily, a defendant has an extremely difficult burden to show that [fraudulent concealment allegations are] barred as a matter of law." *Volk*, 816 F.2d at 1417. To grant summary judgment, the court must determine that the "uncontroverted evidence 'irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint.'" *Conmar*, 858 F.2d at 502 (brackets in original) (citation omitted).

II. *Affirmative Acts to Conceal*

■ Plaintiffs agree that they "must establish that [their] failure to have notice ... was the result of affirmative conduct by the defendant." *Id.* at 505 (citations omitted).

Passive concealment of information is not enough ..., unless the defendant had a fiduciary duty to disclose the information to the plaintiff. An affirmative act of denial, however, is enough if the circumstances make the plaintiff's reliance on the denial reasonable.

*Id.* (citations omitted).

A. Method of Telephone Contacts

Plaintiffs identify numerous affirmative acts that were designed to conceal the ex-

---

1. The relevant dates are four years before the date on which each plaintiff filed its complaint. 15 U.S.C. § 15b. For California, the relevant date is June 25, 1971; for Arizona, July 22, 1972; for Oregon, February 22, 1973; and for Washington, August 15, 1973.

change of price information. For example, Agnar Nerheim—a Social marketing official intimately involved with the Industry Contact Group—informed other oil companies' executives how surreptitiously to contact each other about pricing by using leased WATS lines, rather than making long distance toll calls. In this way no telephone company record of the call would be made. Nerheim used the network as late as 1967. A reasonable jury could find that establishing the network was an affirmative act.

Defendants argue that even if there were affirmative acts, they were not designed to conceal the conduct from plaintiffs. The proper focus, however, is not whether the intent was to conceal the information from plaintiffs, but whether the "concealment ... prevented [plaintiff] from being alerted". *Id.* This is an issue of causation, traditionally one within the province of the jury.

The purpose of establishing and using the network was admittedly to keep price contacts secret. By eliminating telephone records, defendants minimized the risk that a grand jury subpoena or private litigant using discovery would uncover the communications or that a "whistleblower" employee might see the records and report the matter. There is no one else the secret needed to be kept from.

Where price exchanges were accomplished by "mailing of discount and price information to its competitors in 'plain white envelopes'", the Ninth Circuit found "a reasonable juror could conclude that this evidence sufficed to show that [defendant] sought to fraudulently conceal the alleged conspiracy." *E.W. French,* 885 F.2d at 1399–1400. Similarly, a reasonable jury could find defendants' network for intercompany telephone communications was designed to conceal their alleged conspiracy. This is a controverted issue of material fact.

## B. General Manner of Communications

Nerheim admitted that the contacts could have been made by telephone, but stated that "most of the time it would be in person." Further, Nerheim had been specifically instructed by his superiors not to put down on his expense account reports the names of any competitors whom he took to lunch.

Not only were these contacts personally made, but no records were kept of these communications. In deposition testimony, Nerheim stated that the contacts were made to substantiate a "meeting competition" defense, if they were ever sued for price discrimination. If this were their true purpose, however, the contacts would have been of no evidentiary value since they were totally undocumented. A jury could reasonably find that the purpose of making these contacts in person and not making any record of them was so that they would not be discovered.

In this same vein is the 1971 memorandum by W.V. Butler of Mobil, recounting that "[m]any individual items were discussed ... none of which will be enumerated here or in writing anywhere. A system was devised and agreed to, by which local legal 'blessing' will be obtained, *verbal* communications maintained, and quick action achieved."

The memorandum concluded that "the recent accelerated growth of independent marketers ... [was] the primary negative factor affecting Mobil performance" and that independents were gaining power because of greater "price differentials in an increasingly price sensitive environment." In light of other evidence of price exchanges, a jury could infer that the purpose of the practice of limiting pricing communications to verbal communications only was to conceal their existence.

Defendants argue that Butler intended nothing of the sort—that he was only interested in "achieving quick action" by avoiding getting bogged down in bureaucratic paperwork. Even assuming that defendants' interpretation is a reasonable one, the proper inference to be drawn remains a disputed question of fact, *i.e.,* defendants' proffered explanation is not the *only* permissible inference that the trier of fact *must* draw.

Defendants' suggestion that the failure to make written records is not an affirmative act is nothing more than semantic quibbling. Viewed as implementing a policy prohibiting written communications and making only person-to-person contacts so that no writings would be generated, the actions fairly can be characterized as "active." Moreover, Nerheim's notations of "special expenses," instead of accurately recording competitor contacts regarding pricing information, is clearly affirmative conduct. *E.W. French*, 885 F.2d at 1399–1400.

### C. Document Destructions

There is also evidence that, if a document reflected information which could later be damaging in an antitrust suit, defendants' common practice was either to redraft the document without the damaging information or to destroy it.

An example of this is a 1970 cover letter by Bill Chesser, an employee of Standard Oil. Defendants argue that the jury cannot infer from this that Socal regularly sanitized its records.

Defendants' first argument that the document was not destroyed, only thrown away, is meritless. There is no logical distinction between fraudulent concealment by throwing away items rather than by physically destroying them. That both Chesser and Dervaes discarded their copies supports the inference that they intended to conceal the incident. As for the distinction that this was a Florida gas station, the jury could reasonably infer that Socal's Florida document destruction policies did not vary from its policies in other states. Dervaes's testimony as to motives simply produces a factual question for the jury.

### D. Conclusion

In *E.W. French*, the Ninth Circuit reversed a directed verdict, ruling that "alleged denials [of price information exchanges] coupled with the use of 'plain white envelopes' ... sufficed to show that [defendant] sought to fraudulently conceal the alleged conspiracy." 885 F.2d at 1399–1400. In *Conmar*, the Ninth Circuit re-

versed a defense summary judgment, in part ruling that, "A jury could believe that the filing of false customs forms was affirmative conduct sufficient for a finding of fraudulent concealment which prevented [plaintiff] from being alerted to the manipulation of ... prices." 858 F.2d at 505.

The methods defendants used here are no less affirmative or sophisticated than those involved in *E.W. French* and *Conmar*. In fact, defendants efforts to conceal their conspiracy were even more extensive than those which the Ninth Circuit found sufficient to present a jury question in *E.W. French* and *Conmar*.

### III. *Knowledge by Plaintiffs of the Claim*

Plaintiffs must also raise a genuine issue that they "had neither actual nor constructive knowledge of the facts giving rise to [their] claim despite [their] diligence in trying to uncover those facts." *Id.* at 502. Ordinarily, however, "whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact." *Volk*, 816 F.2d at 1417.

### A. Actual Knowledge

Plaintiffs declare that they did not know about the horizontal price fixing until the anonymous informant tipped them off. This is sufficient to raise a factual dispute for jury determination. However, defendants contend that plaintiffs (collectively) actually knew of their claims under two different theories. Actually, although defendants seek to apply them to all plaintiffs, these arguments apply only to California and Arizona, respectively.

#### 1. *California*

Defendants argue that plaintiffs learned nothing between 1971 and 1975 that would have prompted them to file a complaint and, therefore, must have known of their claims prior to 1971.

This argument is only relevant to California's claims. The other states did not file complaints until after September 1975, when they claim to have first learned of the Industry Contact Group through the

anonymous informant. Whether the other states were truly ignorant of the price-fixing conspiracy until after learning of the informant seems plainly a question of fact, unaffected by whatever knowledge may be imputed to California.

As California points out, it did not aver the existence or activities of the Industry Contact Group until its Second Amended Complaint in 1977 and neither did it previously address the type of price-fixing conspiracy that it has subsequently litigated. Further, California identifies the 1972–1973 oil shortage, a Federal Trade Commission (FTC) proceeding initiated in 1973, and suits brought by Florida, Connecticut, and Kansas in 1973 and 1974, all of which a jury could believe prompted it to file a complaint alleging a horizontal price fixing conspiracy in June 1975.

Defendants assert that California's reliance on the 1972–1973 oil shortage does not amount to a "fact" but only a "suspicion" or "belief" that the shortage was artificially caused. Defendants do not explain why the FTC and other three states' lawsuits are not adequate independent information. Nonetheless, the shortage is a fact. Whether it may have prompted the price-fixing claim is a question for the jury.

California also presents a plausible explanation for its price fixing allegations in June 1975. California argues that its original complaint was prompted by a legislative report accusing the oil companies of not competitively bidding and that this was its original intended focus. In light of the other antitrust litigation, California says that including a horizontal price fixing claim seemed "prudent".[2] It intended to develop the claim, if possible, through discovery. Prior to the Second Amended Complaint in 1977, California never based its allegations on the Industry Contact Group's network. Nor were California's claims based on the price postings or press releases since, it claims, it did not understand the purpose and motivation behind the press releases and price postings. A jury could reasonably believe this.

### 2. *Imputed Knowledge to Arizona*

■ Plaintiff in *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir.1976), was represented by a San Francisco attorney, Frederick P. Furth. Hanson was a retail gasoline dealer in Arizona and sued Shell, Chevron and Gulf for antitrust violations, alleging that defendants created price wars designed to drive the independents out of business. At the same time, Furth was also retained to represent the State of Arizona in the *Western Liquid Asphalt* cases, also antitrust litigation against the defendants here. Furth, of course, was not the Attorney General of Arizona. Nor was he retained as general antitrust counsel; only to litigate the cases on which he was retained.

Defendants contend that the knowledge Furth gained in *Hanson* should be imputed to Arizona because he was, at the same time, also representing Arizona in antitrust litigation. At the very least, Furth appears to have had no ethical obligation to pass on such information to Arizona; in fact, some of it may have been privileged. More to the point, however, is that the discovery in *Hanson* was covered by a protective order. Thus, Furth was *prohibited* from disclosing any relevant information gleaned from the discovery in *Hanson* to Arizona. The discovery order did not expire when the *Hanson* case ended. As late as August 1977, after Furth had been retained to represent Arizona in MDL 150, Shell continued to insist that the *Hanson* protective order prohibited him from disclosing any information gained in discovery in that case.

Defendants have not established that, as a matter of law, attorney Furth's knowledge of the facts in *Hanson* should be imputed to Arizona. Indeed, the state of the record is such that the court could very nearly *sua sponte* grant summary judgment on this issue to plaintiffs.[3]

---

2. As plaintiffs point out, a much more lenient version of F.R.Civ.P. 11 was then in effect.

3. Nor is *Klein v. Bower*, 421 F.2d 338 (2d Cir. 1970), relied on by defendants, relevant. It simply held that plaintiff's attorney should have recognized a federal claim arising out of a state claim. It did not involve attempts to impute the knowledge of one client to another.

### B. Constructive Knowledge

 Constructive knowledge exists when a plaintiff "should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim." *Conmar*, 858 F.2d at 502 (citation omitted). However, knowledge of facts relevant to their claim will not amount to constructive knowledge if those facts were not of a type to prompt investigation. *Id.* at 504–05. Nor is there constructive knowledge if, even upon investigating, plaintiffs might reasonably be unable to uncover their claims. *E.W. French*, 885 F.2d at 1400. Further, public access to information does not incontrovertibly establish constructive knowledge of one's claims. *Id.; Conmar*, 858 F.2d at 504. Even where a plaintiff actually knows of public speculation, constructive knowledge cannot be established absent "awareness of 'some evidence tending to support it.' " *Id.* (citation omitted); *E.W. French*, 885 F.2d at 1400.

#### 1. *California Attorney General's Investigation*

Defendants' first argument focuses on California's 1960–1961 investigations into gasoline price wars. This is unavailing. First, the report clearly concluded that there was no evidence of any antitrust violations. Further, the report did not state that an investigation into other antitrust violations was "required", only that if a determination were to be made on whether antitrust violations occurred, the decision could not be based on the relatively short 30–day investigation that had previously been authorized.

Finally, to the extent any investigation was contemplated, it was expected to focus on "below cost selling", *i.e.*, predatory pricing. The Attorney General's Office was originally investigating price discrimination. The claim being litigated here is a horizontal conspiracy to fix prices. All antitrust violations are not alike. Knowledge of predatory pricing and price discrimina-

tion charges does not amount to constructive knowledge of horizontal price fixing as a matter of law.

Plaintiffs assert that there is no way they could have discovered or suspected the existence of the Industry Contact Group without the aid of the informant. Without knowledge of the Industry Contact Group, they contend, they would not be litigating the claims currently before this court. Even though California did not follow up on this report, it is not established as a matter of law that further investigation would have uncovered the Industry Contact Group or defendants' other alleged antitrust violations.

#### 2. *Private Lawsuits*

##### a. Filing of Lawsuits as Constructive Knowledge

 To find constructive knowledge of their own claims because of a lawsuit brought by others requires a chain of inferences. First, the lawsuit must have been sufficiently similar such that, if meritorious, plaintiffs should suspect that they too had a claim for relief. Second, the lawsuit must have had a legal and factual basis since constructive knowledge cannot be premised on a frivolous claim. *Conmar*, 858 F.2d at 503–04, *E.W. French*, 885 F.2d at 1400. Next, plaintiffs must have had reason to know about the lawsuit since, as previously explained, the availability of information in the public domain does not compel finding constructive knowledge. Finally, plaintiffs must have been able to determine the suit had merit.

 Defendants claim that plaintiffs should have had constructive knowledge of their claims from three private actions.[4] The first two cases relied on are the *Hanson* case, discussed in Section III.A.2, above, and *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir.1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). Their lack of relevance to the issue at hand

---

**4.** Defendants actually cite to five cases. However, the relevance of two of them, *Wolverton Oil Co. v. Shell Oil Co.* and *Knopp, Zukin & Co. v. Shell Oil Co.*, is unexplained. Constructive knowledge depends on the facts and claims con-

tained in the prior lawsuits. Because defendants do not explain the relevance of these two cases, they cannot serve as the basis of summary judgment.

has been essentially established by the Ninth Circuit's analysis of those claims as compared to the instant one.

[A]s the appellants correctly note, the claims in *Hanson* and *Gray* were quite the opposite of those alleged in this case.... The plaintiffs in *Hanson* and *Gray* sought to establish that the defendants had conspired to *create* price wars in order to drive independent marketers out of business....

By contrast, the evidence in the present case amply supports an inference that the exchange of price information by the appellees was done with the purpose and effect of allowing greater coordination and stabilization of prices. Thus, while in *Hanson* we distinguished *Container* [*United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526], noting that "[t]he goal of either company was not shown to be price stabilization ...," exactly the opposite is true in this case.

*In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 452 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991) (emphasis in original).

The third private action relied on by defendants is *Mohawk Petroleum Corp. v. Shell Oil Co., et al. Mohawk*, contained only a single claim remotely resembling any of plaintiffs' claims. *Mohawk* alleged that certain oil companies conspired "to fix uniform and noncompetitive wholesale prices for petroleum products." The claimed uniformity was allegedly achieved through product exchanges which discriminated between independents and majors as to location, quality, price, and other terms. *Mohawk* also complained of below-cost pricing. It goes on to allege that defendants were instigating price wars and causing service stations "to sell at unreasonably low prices."

The mere fact that the *Mohawk* complaint was filed does not compel the conclusion that plaintiffs had constructive knowledge of the allegations it made. In *Conmar*, the Ninth Circuit approvingly discussed *In re Beef Indus. Antitrust Litig.*,

600 F.2d 1148 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980), which held that the filing of a similar lawsuit that received "widespread industry publicity ... was 'not *as a matter of law* tantamount to actual or constructive knowledge of their claim' without awareness of 'some evidence tending to support it.'" *Conmar*, 858 F.2d at 504, quoting *Beef Indus.*, 600 F.2d at 1171 (emphasis in original).

Even if a plaintiff is held to "know" the contents of all public records, "that knowledge would not necessarily justify the filing of a complaint, and so the issue of whether the statute of limitations was tolled would be inappropriate for summary judgment." *Id.* In *E.W. French*, the Ninth Circuit again addressed the notice imputed by the filing of a lawsuit and, again quoting *Beef Indus.*, stated:

The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so *as a matter of law* is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights.

885 F.2d at 1400 (emphasis in original) (citation omitted).

Defendants have not shown, nor is it self evident, that the filing of *Mohawk* (or any of the other litigation) imputed to plaintiffs knowledge of their claims as a matter of law. The filing of these lawsuits does not "irrefutably demonstrate[ ] that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint." *Conmar*, 858 F.2d at 502 (citation omitted). The issue remains one for the jury.

b. Media Coverage of Lawsuits

Nor was the media coverage of these complaints so extensive as to compel the conclusion that plaintiffs should have known of their own claim. When *Mohawk* was filed, the San Francisco *Examiner* gave it a relatively prominent headline—on page 65. The only other coverage before 1969 were an article in a BNA reporter, the Berkeley *Gazette*, and a trade journal, *The Oil and Gas Reporter*. The only informa-

tion listed in these articles is typically nothing more than the fact of the lawsuits and a summary of the allegations made. In 1971, two Arizona dailies published two articles addressing the first jury's verdict in *Hanson.*

In *Conmar,* the Ninth Circuit refused to impute constructive knowledge as a matter of law where an indictment covering the same subject matter as the plaintiffs' complaint was covered by "two articles in the San Francisco Chronicle ... [,] The Los Angeles Times ... [,] The New York Times ... Business Week and the San Jose Mercury–News." *Conmar,* 858 F.2d at 500–01. Further, a pre-indictment investigation identifying the exact violations complained of by the Plaintiffs were mentioned in "one San Francisco Chronicle article ... [and] one Wall Street Journal article." Additionally, there was yet another *Wall Street Journal* article covering the events. Nonetheless, in part because most of these articles generally focused on the falsifications rather than identifying the specific products and specific distributors, the Ninth Circuit refused find that coverage was so extensive as to require a finding of constructive knowledge as a matter of law.

The small handful of articles here pales in comparison to the preeminence of the major, nationally-distributed magazine and newspapers involved in the *Conmar* case. If constructive knowledge was not established in *Conmar,* then *a fortiori* it has not been established here.

> The leap from the plaintiffs' knowledge of the ... complaint to actual or constructive knowledge of their cause of action therefore involves factual issues.... [A]n inference that the plaintiffs would have discovered adequate support before [the start of the limitations period] had they been reasonably diligent ... is not so compelling as to entitle the defendants to summary judgment.

*Id.* at 504 (brackets in original), quoting *Beef Indus.,* 600 F.2d at 1171.

### c. Discovery as Constructive Knowledge

The evidence developed in these private lawsuits did not put plaintiffs on notice of their potential claims since that information was the subject of protective orders. Even if plaintiffs knew about the lawsuits, they did not have access to the discovery. The mere fact that plaintiffs knew about this testimony now does not mean they necessarily knew about the testimony when it was originally given.

The Ninth Circuit adopted a similar approach in *Conmar.* It there held that "Conmar's mention of [defendants' guilty pleas] in its complaint does not constitute an admission that these pleas put it on constructive notice of its claim, nor does its filing of the complaint four years after the indictment concede that it learned of its cause of action when the indictment was filed." *Conmar,* 858 F.2d at 502. Similarly, plaintiffs use of deposition testimony now does not indicate that they knew of the testimony when it was being given.

Nor did the trials in *Hanson* and *Jones/ Gray* constructively notify plaintiffs of their claims as a matter of law. Defendants strongly rely on the Tenth Circuit's statement that "when the very facts allegedly concealed are available in public records, the argument that the plaintiffs should, as a matter of law, be held to constructive knowledge of their cause of action is much stronger." *Maughan v. SW Serv'g, Inc.,* 758 F.2d 1381, 1388 (10th Cir. 1985). The Ninth Circuit approved of this reasoning in *Conmar,* 858 F.2d at 505, but rejected a dogmatic application.

The circumstances here do not warrant the conclusion that plaintiffs must have known of the trial testimony when it was given. The testimony in the *Jones/Gray* case only reflected that competitor contacts were made. In the Ninth Circuit's review of the judgment, it concluded that the jury could reasonably decide that the contacts were made to assure that "dealer assistance" discounts were necessary and not for the purpose of establishing artificially *low* prices and inducing price wars. *Gray v. Shell Oil Co.,* 469 F.2d at 746–47.

Reviewing the judgment in *Hanson,* the Ninth Circuit again found that a jury could have concluded that the contacts were

made to assure that prices were competitive and not to fix prices at an anti-competitive low level. The court also held that the trial court did not abuse its discretion in finding, after the first trial, that the opposite conclusion was against the clear weight of the evidence. *Hanson,* 541 F.2d at 1359–60.

Further, defendants identify nothing in the testimony which mentions the Industry Contact Group. Without knowledge of the Industry Contact Group, plaintiffs state they would not be pursuing the current claims. Whether plaintiffs should have known about the trial and been prompted to investigate if they too had a claim is a jury question. Nothing "irrefutably demonstrates" that plaintiffs knew or should have known of this testimony or knew or should have known that the real reason behind the contacts was not lowering prices but raising them, but, nonetheless, failed to file a complaint.

### 3. *Grand Jury Investigations & Media Coverage*

#### a. California Federal Grand Jury

Federal grand juries were convened in San Francisco and, later, in Los Angeles, in 1961 and 1962, to investigate possible antitrust violations by the major oil companies. The initial news articles identified only the entities subpoenaed, making no mention of the charges. Articles containing more detail generally made nothing more than a vague reference to investigating the pricing system. No information was supplied as to what aspect of pricing, *i.e.,* whether predatory pricing, price fixing, or price discrimination, was being investigated.

Only one of the early reports—a four-paragraph article in the *Oil Daily*—suggested that the grand jury was "investigating possible price fixing in the sale of gasoline in Northern California." However, another article cited an industry insider as explaining that the inquiry into the pricing structure was unwarranted because recent "5¢ to 6¢ leaps going up [were] to reach pre-price-war levels". *Nat'l Petroleum News,* Oct. 1975, at 75. Even if plaintiffs were on notice of this article, it suggests a *vertical* price fixing arrangement, not a horizontal conspiracy.

There was also suspicion that the inquiry was focused on the retail price differential between independents and the seven major oil companies, *i.e.,* involved price discrimination. *Nat'l Petroleum News,* Feb. 1961, at 81; *Nat'l Petroleum News,* May 1962, at 66. Later, however, suspicion returned to suggesting that the grand jury was investigating price fixing, while the State of California was investigating price wars. S.F. *News–Call Bull.,* Sept. 15, 1962, at 1. Oil industry insiders insisted that any inference of collusion "would be ... far-reaching." *Nat'l Petroleum News,* May 1962, at 66.

With the exception of two nearly-illegible photocopies, defendants have presented no evidence that this investigation was covered outside the oil industry's trade journals. Even the two articles they submit, from San Francisco newspapers, are tiny space-fillers of one and three inches.

There is nothing to suggest that plaintiffs must have known that the explanations offered in the trade journals were a ruse and that the investigation was well-founded. Defendants' contention to the contrary is significantly undermined by the fact that no indictment was ever returned by these grand juries.

For the same reasons discussed above regarding media coverage of the private lawsuits, publicity surrounding the grand jury investigation was not of the type that, as a matter of law, must have prompted plaintiffs to investigate and discover their claims. *Conmar,* 858 F.2d at 500–01, 503.

#### b. Arizona Federal Grand Jury

A federal grand jury was also convened in Arizona. Just like the California grand jury, however, the investigation's scope was undecipherable. An industry journal reported the subpoenae as being so wide in scope as to be a "vacuum cleaner operation." *Nat'l Petroleum News,* Nov. 1962 at 82. The article noted that "[o]rdinarily oil attorneys can glean a hint of an investigation's objectives by studying the information sought in the subpoenas, but not so this time. So broad are the terms of in-

quiry that 'it's not at all apparent what they're shooting for,' says one [attorney]." *Id.* If the oil companies' attorneys could not determine what the federal grand jury was investigating, there is no reason to impute superior knowledge to the states.

One source speculated that the focus of the investigation was "something fundamental ... like suspected horizontal price discrimination or suspected vertical conspiracy to fix price." *Id.* The article concluded by noting that an earlier nine-month grand jury "end[ed] without indictments or other official action." *Id.* Horizontal price fixing was nowhere mentioned.

Although the Los Angeles office of the Justice Department's Antitrust Division hinted that the Arizona probe focused on "possible price fixing in Arizona ... [h]e would not—as is customary in federal investigations—elaborate on the findings". Phoenix *Evening Am.,* July, 28, 1964. The regional director "was noncommittal when asked if he would present evidence of any gasoline price fixing to the federal grand jury." The article concluded by returning to the price war motif by tying in a retail trade association's claim that the major oil companies were "continuing a gas price war that has been going on ... for years."

Outside of industry publications, the only media coverage of this investigation were two articles in the Phoenix *Gazette* (one in 1962, another in 1963), one article in the Phoenix *Evening American* (1964), and one article in the San Francisco *Examiner,* which was not published until 1971. Neither of the first two articles mentioned price fixing, only an investigation into the pricing of gasoline generally. The third article—the one in the Phoenix *Evening American*—only mentions price fixing to the extent that the United States Attorney's office in Phoenix declined to comment after the Los Angeles field office had suggested that it was the focus. Not until the 1971 San Francisco *Examiner* article was price fixing clearly the focus. Even then, the context was once again price wars.

Plaintiffs are not litigating price discrimination claims, predatory pricing or "price wars" among retailers. The articles do not hint that horizontal price maintenance was the investigation's focus.

Defendants' evidence of media coverage is insufficient to disallow, as a matter of law, plaintiffs' contention that their current claims were undiscoverable absent the anonymous informant, especially in light of the fact that Arizona grand jury never returned an indictment.

c. Final Results of Grand Juries

In 1971, the San Francisco *Examiner* reported that the Department of Justice and the FTC were both investigating price fixing allegations in at least seven states. S.F. *Examiner,* Mar. 3, 1971, at 53. The investigations were said to be focused on price wars and geographic price discrimination. No mention was made of price posting, price information exchanges, or attempts to stabilize or to agree on high prices.

Whether plaintiffs should have realized that an investigation of their own was warranted, following up on 10 years of multiple federal grand jury investigations without a single indictment being returned, and whether they should have uncovered wrongdoing of the type they currently are complaining about is an issue for the jury.

4. *Price Posting*

Price posting was not as public an activity as defendants suggest. While defendants were communicating to the public "this is our price", plaintiffs assert that they were furtively communicating to each other "this should be your price too and these are the discounts you should be giving." Although the first message was clearly in the public domain, it is not the one complained of. It is the second message, the one that was not publicly stated, that is the foundation for plaintiffs' lawsuit. What had all appearances of being innocent conduct, plaintiffs argue, was illegal price communications. There is no reason why the former should have necessarily caused plaintiffs to suspect that the latter was actually transpiring.

IV. *Due Diligence*

■ "The requirement of diligence is only meaningful ... when facts exist that

would excite the inquiry of a reasonable person." *Conmar*, 858 F.2d at 504. Due diligence is not required in the abstract. Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have.

It is impossible to declare at this stage that plaintiffs failed to exercise due diligence to follow up on that which may or may not have been sufficient to excite their suspicions. As in *Conmar*, "because ... there is a genuine issue of material fact whether the facts publicly available were sufficient to excite [plaintiffs'] inquiry, then no due diligence need be demonstrated for [plaintiffs] to survive summary judgment." *Id.* at 504–05.

## V. *Union Oil*

Union Oil Co. asserts that the fraudulent concealment claims cannot extend to it because it was not part of the conspiracy. This goes to the merits of the controversy, not simply the statute of limitations question. In effect, in its separate reply memorandum, Union is seeking summary judgment on the entire claim. The issue of whether or not Union was a member of the charged conspiracy is not before the court on this motion for summary judgment.[5]

## CONCLUSION

Plaintiffs have presented evidence that defendants took affirmative steps to conceal their conspiracy. Whether these steps prevented plaintiffs from discovering their claims is a question for the jury. There are also genuine issues of fact as to whether plaintiffs actually knew of their claims before the limitations period began to run. It is up to the jury to determine as of what date plaintiffs should have learned of their claims. Because factual disputes surround the issue of imputed knowledge, plaintiff's diligence also remains unresolvable at this stage. Further, the record does not establish that plaintiffs lacked diligence in pursuing the information they learned prior to

the limitations period. Although defendants have made some strong arguments why plaintiffs should not be entitled to rely on the doctrine of fraudulent concealment, they are arguments which should, and must, be made to the jury.

## ORDER

IT IS ORDERED that, for the reasons set forth above, defendants' motion for summary judgment on fraudulent concealment is DENIED.

---

5. For obvious reasons, the court will not reach a new issue such as this which is raised for the first time in the reply.